UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| In re: | Chapter 7 |
| Daniel A. Swinehart, | Case No. 18-25585-kmp |
|     Debtor. | |

| | |
|---|---|
| Richard Sonnentag and | |
| Marie Sonnentag, | |
|     Plaintiffs, | |
| v. | Adversary No. 18-2198 |
| Daniel A. Swinehart, | |
|     Defendant. | |

**DECISION AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT**

      Daniel A. Swinehart, the Debtor in this bankruptcy case, is the sole member of Infinity Custom Builders, LLC d/b/a Infinity Custom Homes ("Infinity"). Richard and Marie Sonnentag (the "Plaintiffs" or "Sonnentags") hired Infinity as the general contractor to make improvements to their residence. The Plaintiffs allege that the Debtor and Infinity received materials from Alexander Lumber Company but failed to pay that company. In response, Alexander Lumber claimed a lien on the Sonnentags' residence and then sued the Sonnentags to foreclose its lien. The Plaintiffs and Alexander Lumber settled for $22,000. The Plaintiffs seek treble damages from the Debtor in the amount of $66,000, plus attorneys' fees, and a determination that the debt owed to them is non-dischargeable pursuant to 11 U.S.C. § 523(a)(4), based on fraud or defalcation by the Debtor as a fiduciary under Wisconsin's theft by contractor statute. The Debtor moved for summary judgment. Based on the premise that Infinity spent more money on the Sonnentags' project than it received from the Sonnentags, the Debtor draws the conclusion that he complied with the relevant Wisconsin statute, and as a matter of law, cannot have

1

committed defalcation. For the reasons that follow, the Court denies the Debtor's Motion for Summary Judgment (the "Motion").

## Statement of Jurisdiction

The Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 1334 and the order of reference from the district court pursuant to 28 U.S.C. § 157(a). *See* Order of Reference (E.D. Wis. July 10, 1984) (available at www.wied.uscourts.gov/local-rules-and-orders). As a proceeding to determine the dischargeability of a debt, this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and the Court may enter a final judgment. 28 U.S.C. § 157(b)(1). The Complaint did not contain a statement pursuant to Bankruptcy Rule 7008 that the Plaintiffs do or do not consent to entry of a final order or judgment. The Answer did not contain the similar statement required by Bankruptcy Rule 7012(b). Accordingly, both parties have forfeited their right to withhold consent to the Court's entry of final orders or judgments. Local Rules 7008, 7012.

## Summary Judgment Standard

Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056. At the summary judgment stage, the role of the court is not to weigh evidence, but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In determining whether there is a genuine issue of material fact, the Court must construe facts and inferences in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

2

Case 18-02198-kmp    Doc 15    Filed 10/15/19    Page 2 of 16

**Discussion of Law and Resolution of Issues/Analysis**

I.  **There Are Genuine Issues of Material Fact for Trial Related to Whether the Debtor Used All of the Funds That He Obtained from the Sonnentags on the Sonnentags' Project.**

The Sonnentags have asserted the debt is non-dischargeable as debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). The Sonnentags bear the burden of establishing this exception to discharge by a preponderance of the evidence. *Estate of Cora v. Jahrling (In re Jahrling)*, 816 F.3d 921, 925 (7th Cir. 2016). The Debtor agrees that in this case, the elements of the § 523(a)(4) exception to discharge are that: "(1) a trust existed, (2) the debtor was a fiduciary of the trust, and (3) the debtor committed fraud or defalcation while carrying out the fiduciary responsibilities associated with the trust." (Debtor's Brief, p. 3) (citing *Building Trades United Pension Tr. Fund v. Mueller (In re Mueller)*, Ch. 7 Case No. 10-23917-svk, Adv. No. 10-2351, 2011 WL 2360122, at *2, 2011 Bankr. LEXIS 2290, at *4 (Bankr. E.D. Wis. June 8, 2011)). The Debtor does not dispute that the first two elements are satisfied. (Debtor's Brief, p. 4). Instead, the Debtor challenges the existence of the third element under § 523(a)(4), "fraud or defalcation," maintaining that, as a matter of law, the Sonnentags are unable to prove this element.

The Sonnentags assert that the Debtor violated Wisconsin's theft by contractor statute and committed defalcation. Wisconsin's theft by contractor statute provides that funds paid by an owner for improvements "constitute a trust fund only in the hands of the prime contractor or subcontractor to the amount of all claims due or to become due or owing from the prime contractor or subcontractor for labor, services, materials, plans, and specifications used for the improvements, until all the claims have been paid. . . ." Wis. Stat. § 779.02(5). Further, "[t]he use of any such moneys by any prime contractor or subcontractor for any other purpose until all

3

claims, except those which are the subject of a bona fide dispute and then only to the extent of the amount actually in dispute, have been paid in full or proportionally in cases of a deficiency, is theft by the prime contractor or subcontractor of moneys so misappropriated and is punishable under s. 943.20." *Id*. If the contractor is a limited liability company, as is the case here, misappropriation of funds is deemed theft by a member responsible for the misappropriation. *Id*.

The parties agree that the Sonnentags contracted with Infinity, the Debtor's company, for improvements to their real property, and they agree that the Sonnentags paid $121,083.50 to Infinity. The agreement ends there. The parties disagree about how Infinity and the Debtor spent the funds. The Sonnentags claim that the Debtor used the funds they paid for their project for personal expenses, "including but not limited to cash withdrawals, restaurants and hotels, and to pay the operating expenses of Infinity and the creditors of Infinity for work unrelated to the improvements to the Property." (Complaint ¶ 15). The Sonnentags further claim that the Debtor has not provided proof that the invoices that were paid by the Debtor were the invoices for labor and materials on the Sonnentags' project. (Plaintiffs' Brief in Opposition to Motion for Summary Judgment, p. 4). In support of their position that the Debtor has not traced his use of the funds, the Sonnentags note that the Debtor acknowledged that he had a "horrible tracking method" for money coming into his business and for money going out to pay bills on projects, and that the Debtor admitted that he "commingled customer funds in one account, that the segregation of customers' money was all in [the Debtor's] head and that as bills came in [the Debtor] paid them from whatever funds were in that single account." (*Id*.; Nordholm Aff. ¶ 3).

The Debtor, on the other hand, maintains that the full amount paid by the Sonnentags went only towards expenses related to the Sonnentags' project. (Swinehart Aff. ¶ 12). The Debtor argues that Infinity paid out more on the Sonnentags' project than it received from them.

(*Id.* ¶¶ 7-9, 10, 12, 14). Consequently, the Debtor maintains he did not violate the theft by contractor statute, and because he complied with his duties under the statute, he cannot have committed defalcation.

There is authority for the proposition that a general contractor who uses all funds received for a project to pay subcontractors and suppliers does not violate the theft by contractor statute simply because those subcontractors and suppliers are not paid in full. In *Capital City Sheet Metal, Inc. v. Voytovich*, 217 Wis. 2d 683, 578 N.W.2d 643 (Ct. App. 1998), a roofing subcontractor sued the general contractor in charge of construction of a house, asserting that it only received $5,500 from the general contractor on a total contract of $9,058 and demanding that the balance of $3,558 be paid to the subcontractor. The trial court entered judgment in favor of the subcontractor and determined that the general contractor's president was personally liable to the subcontractor for the balance due on the contract.

On appeal, the record indicated that the general contractor paid out more on the project than it received from the homeowner. The general contractor argued that he could not have violated the theft by contractor statute – which places funds in trust to pay claims for labor and materials used on the contract – when the undisputed evidence showed that "all funds he received from [the homeowner] were paid out to various subcontractors." *Id*. at 687. The court of appeals agreed with the general contractor, and reversed the trial court's decision, holding that the general contractor's president did not commit theft by contractor and therefore was not personally liable to the subcontractor for the balance due on the contract.

In reaching its decision, the court of appeals distinguished a previous case, *Capen Wholesale, Inc. v. Probst*, 180 Wis. 2d 354, 364, 509 N.W.2d 120, 124 (Ct. App. 1993). In that case, a supplier delivered roofing materials to the general contractor, who used them on several

5

projects for which the general contractor received full payment. Because the general contractor did not pay the supplier, but instead used the funds he received to pay other, unrelated "corporate expenses," the court of appeals concluded that the general contractor had violated the theft by contractor statute, specifying that "the use of any such moneys . . . *for any other purpose* [than paying the subcontractors] . . . is theft by . . . contractor." *Id.* (emphasis in original). "[T]he contractor need not misappropriate the funds for purely personal gain to be personally liable under the statute; the statute also applies where the contractor uses the 'trust' funds for 'corporate' purposes unrelated to the contract in question." *Capital City Sheet Metal*, 217 Wis. 2d at 688.

The *Capital City* court contrasted the facts of its case with the facts in the *Capen* case. The court of appeals in *Capital City* acknowledged that "[u]sing the funds for some other purpose – whether personal or corporate – violates the [theft by contractor] statute, and the officers of the corporation may be held personally liable to the subcontractors and suppliers." *Id.* at 689. But the court went on to note that in the *Capital City* case, unlike the *Capen* case, the general contractor used the funds received from the homeowner "to pay the very people and entities on whose behalf the statute imposes the trust: the subcontractors and the suppliers of labor and materials for the [homeowner's] project." *Id.* The court of appeals rejected the subcontractor's argument that the general contractor breached the trust by using money held in trust for the subcontractor for the payment of other corporate obligations, noting:

> The record does not indicate that any of the funds [the general contractor] received from [the homeowner] went to anyone else or for any other purpose. It is true that [the subcontractor] did not get paid the full amount of its invoice, but that is not the test under the statute. The test is whether the money was, or was not, paid for "labor and materials used for the [contracted-for] improvements," § 779.02(5), Stats., and the record in this case unequivocally establishes that it was.

6

*Id*. at 689-90.

When moving for summary judgment, the movant, here the Debtor, has the burden of proving that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. In this case, that requires the Debtor to prove that there is no genuine dispute as to whether all of the money received by the Debtor from the Sonnentags was paid for labor and materials on the Sonnentags' project and not used for other personal or corporate purposes. In *Capital City*, the court of appeals found that the record "unequivocally" established that the money from the homeowner was paid for labor and materials used for the contracted improvements. Here, the record does not unequivocally establish the same. There remain genuine disputes related to (1) how the Debtor accounted for the money from the Sonnentags on the Cost Spreadsheet submitted in support of the Motion; (2) contradicting evidence from the Debtor and the Sonnentags regarding whether the Debtor commingled customer funds in one account, whether the tracing of customers' money was done all in the Debtor's head, and whether, as bills came in, the Debtor paid them from whatever funds were in that single account; (3) the Debtor's acknowledgement that there may be evidence in this case that the balance of his bank account dropped below the amount the Sonnentags paid with not all of the money paid by the Sonnentags going toward the Sonnentag project; and (4) whether the Debtor paid Alexander Lumber, given the contradicting evidence from the Debtor and the Sonnentags related to the payment of the Alexander Lumber invoice.

A. **Genuine Disputes of Material Fact Related to the Cost Spreadsheet.**

The Debtor maintains that the full amount paid by the Sonnentags went only towards expenses related to the Sonnentags' project. (Swinehart Aff. ¶ 12). The Debtor argues that Infinity paid out more on the Sonnentags' project than it received from them. (*Id*. ¶¶ 7-9, 10, 12,

7

Case 18-02198-kmp    Doc 15    Filed 10/15/19    Page 7 of 16

14). In an attempt to establish this, the Debtor has attached an Affidavit and "Cost Spreadsheet" to his Motion. The Cost Spreadsheet purports to list check numbers, dates, and dollar amounts of checks made payable to contractors for the Sonnentags' project. (Swinehart Aff. ¶ 10, Ex. B). According to the Payment Status Summary also attached to the Affidavit, Infinity expended $124,200.37 on the project, though it only received $121,083.50 from the Plaintiffs. (*Id*. ¶ 8, Ex. A). Therefore, according to the Debtor, he cannot have committed defalcation because he complied with section 779.02(5)'s requirement that he use all the funds received from the Plaintiffs ($121,083.50) to pay the claims of subcontractors on the project ($124,200.37).

However, there are genuine issues of material fact pertaining to the Debtor's accounting in his Affidavit and the Cost Spreadsheet. The Cost Spreadsheet does not identify the invoices paid by invoice number nor does it provide copies of the invoices to show that the invoices were for labor and materials on the Sonnentag project. There is also no evidence provided that as money was paid by the Sonnentags, the money was only used on the Sonnentag project. For example, the Payment Status Report notes that the Sonnentags made a Draw Payment on June 10, 2016 in the amount of $31,000. There has been no attempt by the Debtor to show how the $31,000 was paid to "the very people and entities on whose behalf the statute imposes the trust: the subcontractors and the suppliers of labor and materials for the [Sonnentags'] project," and in fact the Debtor suggests in briefing that "a week later Infinity's bank account balance was less than $31,000.00 with not all the money going towards the Sonnentag project." (Debtor's Brief, p. 5). The same can be said for the July 28, 2016 payment of $23,800, the September 8, 2016 payment of $31,021.25, the October 11, 2016 payment of $19,000, the October 11, 2016 payment of $4,241, and the January 12, 2017 payment of $12,021.25. There remain fact issues as to how the funds paid by the Sonnentags on those dates only went to pay the subcontractors

that worked on the Sonnentags' project and not to subcontractors on other jobs, personal expenses of the Debtor, or other corporate expenses of the Debtor. The Debtor's Affidavit fails to conclusively establish how the Debtor spent funds, and as such, there are genuine issues of material fact as to whether the Debtor misused trust funds and committed fraud or defalcation under § 523(a)(4).

### B. Genuine Disputes of Material Fact Raised by the Debtor's Rule 2004 Examination Testimony.

The Debtor's testimony at his Rule 2004 examination also raises additional fact issues about whether the Debtor used the money paid by the Sonnentags to pay only the subcontractors that worked on the Sonnentags' project and not subcontractors on other jobs, not personal expenses of the Debtor, and not other corporate expenses of the Debtor. The Debtor's testimony also raises fact issues about how accurate the Cost Spreadsheet is, when it was prepared, and whether the Debtor actually paid $124,200.37 to the subcontractors on the Sonnentags' project.

At his Rule 2004 examination, the Debtor offered the following testimony:

> Q. Okay. Now, as a general contractor, you would receive money from various people, either individuals or banks, for work that was to be performed; is that correct?
> A: Correct.
> Q: Did you have any method of segregating or tracking what money that came in and went into this one account was from one person versus another person?
> A: I had a horrible tracking method. I didn't really have one. I would just know that money is coming in to cover the bills that are going out for those projects. I had an Excel spreadsheet, which was a breakdown of most projects, and I would know if we were over or under on some items.
> Q: Did you set up an Excel spreadsheet for each customer with regard to the money that they came -- or the money that they deposited to know how that specific money was being used?
> A: Not really, no.

9

(Nordholm Aff. ¶ 3, Ex. A, p. 26, lines 2-20). The Debtor's Affidavit explains that he prepared the Cost Spreadsheet "based on the records and files of Infinity detailing the costs Infinity paid on the Sonnentag project." (Swinehart Aff. ¶ 10). It is unclear to the Court at this time whether the Debtor prepared the Cost Spreadsheet as money was being paid by the Sonnentags or if he recreated the Cost Spreadsheet for the purposes of supporting his Motion for Summary Judgment. But the Debtor testified at his Rule 2004 examination that he had a "horrible tracking method" for money coming into his business and he "didn't really have one." The Debtor also seems to acknowledge that he did not set up an Excel spreadsheet for each customer for the money that the customer paid in so the customer would know how the money was being spent.

The Debtor also seems to acknowledge that he was not really tracking what money came in and then applying it only to the intended project, but instead was just keeping track of that information in his head. As further stated by the Debtor at his Rule 2004 examination:

> Q: So just to sum up – and you correct me if I'm wrong – but to sum up this last exchange we've had, my understanding is, as you would receive money from banks or from individuals for the work that you were performing on multiple jobs, you would put them into one account; is that correct?
> A: Correct.
> Q: And then as bills came in, you would write a check out of that account; is that correct?
> A: That is correct.
> Q: Okay. And there was no segregation that you managed between the funds that came in in any way, shape, or form?
> A: There was – because we didn't have so many jobs going on at the same time, I guess, the segregation was just on its own.
> Q: Okay. In your head?
> A: Yes.

(Nordholm Aff. ¶ 3, Ex. A, pp. 28-29).

Given the contradicting evidence from the Debtor and the Sonnentags, the Debtor has failed to establish on summary judgment that there are no fact issues related to the tracing of all

10

of the money the Sonnentags paid to only expenses related to the Sonnentags' project. The Sonnentags' evidence suggests the Debtor may have deposited customer funds in one account, kept track of how much money a customer had paid only in his head, and then paid invoices from subcontractors from whatever funds were in that single account, regardless of which homeowner paid the funds. Because the Debtor's Affidavit fails to conclusively establish how the Debtor spent funds, there are genuine issues of material fact as to whether the Debtor misused trust funds and committed fraud or defalcation under § 523(a)(4).

> **C.** **Genuine Disputes of Material Fact Regarding the Tracing of Funds Received from the Sonnentags.**

A representation in the Debtor's own briefing raises an additional fact issue related to whether all of the money received by the Debtor from the Sonnentags was paid for labor and materials on the Sonnentags' project and not used for other personal or corporate purposes. The Debtor's Brief in support of his Motion for Summary Judgment contains the statement that:

> [w]hile there may be evidence in this case that demonstrates Infinity's bank account balance dropped below the dollar amount Sonnentag paid, e.g. Sonnentag paid $31,000.00, a week later Infinity's bank account balance was less than $31,000.00 with not all the money going towards the Sonnentag project; such evidence, if presented, simply reflects mere negligence by Mr. Swinehart, not something more.

If there is such evidence, then using the funds for some other purpose – whether personal or corporate – could violate the theft by contractor statute and the officers of the corporation could be held personally liable. *See Capital City Sheet Metal, Inc. v. Voytovich*, 217 Wis. 2d 683, 578 N.W.2d 643 (Ct. App. 1998); *Capen Wholesale, Inc. v. Probst*, 180 Wis. 2d 354, 509 N.W.2d 120 (Ct. App. 1993). This is another fact issue for trial.

### D. Genuine Disputes of Material Fact Related to Alexander Lumber Company.

Finally, one of the most significant material fact issues raised in the filings made by the Debtor and the Sonnentags that precludes the entry of summary judgment, relates to Alexander Lumber. The basis of the Sonnentags' non-dischargeability claim based on fraud or defalcation by the Debtor as a fiduciary under Wisconsin's theft by contractor statute is that they had to pay $22,000 to Alexander Lumber to obtain a release of the lien that Alexander Lumber had placed on their property after the Debtor failed to pay Alexander Lumber for the materials that it provided for the Sonnentags' project.

The Debtor and the Sonnentags do not agree on whether Alexander Lumber has been paid. In the Debtor's Cost Spreadsheet submitted in support of his Motion for Summary Judgment, the Debtor asserts that he made a $25,000.00 payment to Alexander Lumber on September 16, 2016. (Swinehart Aff. ¶ 10, Ex. B). The Sonnentags counter that assertion with their own Affidavit from Carol Harrington, Alexander Lumber's credit manager, which includes a Customer Account Statement for the Sonnentags' project. Ms. Harrington avers, and the Customer Account Statement shows, that Alexander Lumber "sold to Infinity lumber and materials in the total amount of $35,140.38 and charged Infinity late fees of $1,719.76 for a total of $36,860.14 through January 31, 2017." (Harrington Aff. ¶ 4). Ms. Harrington goes on to affirm that, "No payments have been received from Infinity that are applicable to the Sonnentag Job." (*Id*. at ¶ 5).

This raises even more genuine disputes about material facts: Was Alexander Lumber paid? Did the Debtor properly account for payments that were made on the Sonnentag project on the Cost Spreadsheet? Is the Debtor's Cost Spreadsheet accurate since it includes a payment to Alexander Lumber that Alexander Lumber claims it never received? Was the money paid by the

12

Sonnentags used for labor and materials on the Sonnentags' project only and not used for other personal or corporate purposes? These are all questions that will need to be answered at trial in this matter, raise genuine issues of material fact as to whether the Debtor misused trust funds and committed fraud or defalcation under § 523(a)(4), and preclude the entry of summary judgment.

**II.     There Are Genuine Issues of Material Fact for Trial Related to the Debtor's State of Mind While Acting in a Fiduciary Capacity.**

The "state of mind" analysis involved in determining whether the Debtor has committed "defalcation while acting in a fiduciary capacity" such that the debt owed to the Sonnentags is non-dischargeable under 11 U.S.C. § 523(a)(4) also precludes the entry of summary judgment.

After the Supreme Court's decision in *Bullock v. BankChampaign, N.A.*, 569 U.S. 267 (2013), a finding that a debtor has violated Wisconsin's theft by contractor statute does not per se lead to a determination that debt is non-dischargeable under § 523(a)(4). *See K&D Masonry LLC v. Vieaux (In re Vieaux)*, Ch. 13 Case No. 12-36663, Adv. No. 13-2196, 2013 WL 5935156, at *2-3, 2013 Bankr. LEXIS 4635, at *5-7 (Bankr. E.D. Wis. Nov. 5, 2013). Rather, even if a debtor has violated the statute, the Court "must make a finding regarding the debtor's state of mind while acting in a fiduciary capacity." *Id*.

"Defalcation" as used in § 523(a)(4) need not involve bad faith, but its "state-of-mind requirement requires at least a subjective, *criminal* level of recklessness." *Jahrling*, 816 F.3d at 925; *see Bullock*, 569 U.S. 267. According to the Supreme Court, defalcation requires an "intentional wrong," and the Court defines this term to include conduct a person knows is improper, but also "reckless conduct of the kind that the criminal law often treats as the equivalent." *Bullock*, 569 U.S. at 274. Following the Model Penal Code definition, an "intentional wrong" includes conduct that takes place when a fiduciary "'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to

13

violate a fiduciary duty. . . . That risk 'must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a *gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation.'" *Id*. (quoting Model Penal Code § 2.02(2)(c), p. 226 (1985)).  As described by the Seventh Circuit Court of Appeals, *Bullock*'s definition "is more perspicuously understood as knowing that there is a risk of serious harm and that it can be averted at reasonable cost, yet failing to act on that knowledge." *Stoughton Lumber Co. v. Sveum*, 787 F.3d 1174, 1177 (7th Cir. 2015).  A defendant may have been "playing ostrich—that is, that he suspected that he was violating the law but avoided confirming his suspicion in order to preserve a patina of innocence." *Id*.

Two statements in the Debtor's Affidavit could be construed as an attempt to show that the Debtor did not have knowledge he was violating responsibilities as a trustee under section 779.02(5).  He states, "I did not knowingly commit any theft of funds or theft of trust funds on the Sonnentag project . . ." and "on balance I did not knowingly commit any theft and there is no evidence that any wrongdoing was anything more than simple negligence."  (Swinehart Aff. ¶¶ 17, 20).  The Court's role on summary judgment "is not to weigh evidence, make credibility determinations, resolve factual disputes and swearing contests, or decide which inferences to draw from the facts." *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).  Such conclusory statements in affidavit form cannot establish the Debtor's state of mind, as the Court must weigh evidence and judge witness credibility to determine whether it agrees with the portrayal or not.

The Debtor also claims at one point in his briefing that he may have acted with "mere negligence."  The Debtor's brief states:

> [w]hile there may be evidence in this case that demonstrates
> Infinity's bank account balance dropped below the dollar amount

14

> Sonnentag paid, e.g. Sonnentag paid $31,000.00, a week later
> Infinity's bank account balance was less than $31,000.00 with not
> all the money going towards the Sonnentag project; such evidence,
> if presented, simply reflects mere negligence by Mr. Swinehart, not
> something more.

(Debtor's Brief, p 5). Of course, "negligence is not sufficient to show defalcation within the meaning of § 523(a)(4)." *Jahrling*, 816 F.3d at 926. The implication in the Debtor's brief that he used funds from the Sonnentags for purposes other than their project but only did so "negligently" raises a question of fact for trial. Whether the Plaintiffs can establish the required state-of-mind element of § 523(a)(4) (i.e., an "intentional wrong" or "reckless conduct" or a "conscious disregard of or willful blindness to a substantial and unjustifiable risk that his conduct will turn out to violate a fiduciary duty" or "a gross deviation from the standard of conduct that a law-abiding person would observe in the Debtor's situation") is certainly an open question for trial.

## Conclusion

Unlike the court in *Capital City*, and based upon the evidence before it, this Court cannot say at this time "unequivocally" that Infinity spent the money paid by the Sonnentags on labor and materials on the Sonnentags' project only and not on other personal or corporate purposes. Additionally, the Court cannot assess the Debtor's "state of mind" and determine, as a matter of law, whether the Debtor has committed "defalcation while acting in a fiduciary capacity" such that the debt owed to the Sonnentags is non-dischargeable under 11 U.S.C. § 523(a)(4). The Court has determined that there are genuine disputes of material fact that must be resolved at trial. Accordingly,

IT IS THEREFORE ORDERED: the Debtor's Motion for Summary Judgment is denied.

IT IS FURTHER ORDERED: the Court will hold a status conference on **October 29, 2019**, at **2:15 p.m.** by telephone to schedule a trial and related deadlines in this proceeding.

Dated: October 15, 2019

*Katherine M. Perhach*
Katherine Maloney Perhach
United States Bankruptcy Judge